# In the United States Court of Federal Claims
## OFFICE OF SPECIAL MASTERS
No. 12-285V
**Filed: February 22, 2016**
**(Unpublished)**

* * * * * * * * * * * * * * * * * * * *
| | | |
|---|---|---|
| MONTEZ PETRONELLI, | * | |
| | * | Special Master Gowen |
| Petitioner, | * | |
| v. | * | |
| | * | Damages; Influenza; |
| SECRETARY OF HEALTH | * | Guillain-Barré Syndrome; Attorney; |
| AND HUMAN SERVICES, | * | Lost Wages. |
| | * | |
| Respondent. | * | |

* * * * * * * * * * * * * * * * * * * *

Ronald C. Homer, Conway Homer & Chin-Caplan, P.C., Boston, MA, for petitioner.
Michael P. Milmoe, United States Department of Justice, Washington, D.C., for respondent.

### RULING ON DAMAGES[1]

A hearing to obtain testimony from petitioner on the issue of damages was held on February 10, 2016. At the conclusion of the hearing, the undersigned issued a bench ruling awarding petitioner damages for past and future lost wages, past pain and suffering, past unreimburseable expenses, and various life care items. This order memorializes my bench ruling.

Based on this ruling, the parties are **ORDERED** to file a joint status report **by Thursday, March 3, 2016** providing the net present value of the amounts awarded to petitioner for future wage loss and items for future life care, at a 1% discount rate. See Pet. Ex. 17.

I. **Past and Future Lost Wages**

The undersigned considered all of the parties' filings in support of their respective positions on issues related to petitioner's damages. On the issue of petitioner's lost wages, petitioner's vocational expert reports and supportive literature, her testimony at the hearing, and the striking

---

[1] Because this ruling contains a reasoned explanation for the undersigned's action in this case, the undersigned intends to post this ruling on the website of the United States Court of Federal Claims, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b).

impression of her current condition persuasively established that she is completely disabled from either professional employment as an attorney or other competitive employment. This finding is also well supported by the medical records.

In detail, a questionnaire completed by petitioner's treating neurologist, Dr. Jai Hee Cho, on August 22, 2013, noted that petitioner's difficulties with walking, standing, higher cognitive functions, concentration, memory, judgment and significant fatigue were consistent with her diagnosis of Guillain-Barré Syndrome, albeit the severity and persistence of these symptoms were unusual. Petitioner's Exhibit ("Pet. Ex.") 27 at 1. Dr. Thanh Teresa Dao, petitioner's treating physician, certified (on an application to the United States Department of Education to discharge petitioner's student loans based on total and permanent disability[2]) that petitioner was "unable to engage in any substantial gainful activity in any field of work by reason of a medically determinable physical or mental impairment . . . ." Pet. Ex. 18 at 5. Dr. Dao wrote that as a result of petitioner's Guillain-Barré Syndrome she was "unable to sit [greater than] 1 [hour] at a time due to pain and pressure in lower extremities," was "unable to stand [greater than] 15 [minutes] due to fatigue," was dependent on a cane or wheelchair to walk, was exhausted after "basic self-care activities" (which would then cause her to need "rest for hours afterwards to recuperate"), and had "difficulty concentrating due to [a] combination of Guillain-Barré Syndrome related cognitive impairment, but also due to chronic pain and medication side effects." Id. Dr. Dao's medical opinion, based on an evaluation of petitioner, was entirely consistent with my own observations of petitioner's behavior at the hearing on February 10, 2016. Specifically, petitioner would stand or need a break from testifying every twenty to twenty-five minutes, would lose her train of thought and become aphasic as a result of what she described as flares of pain, and became increasingly fatigued as the proceedings continued. Petitioner testified that standing and/or switching her body's positioning was a technique she learned from a pain management program to help her cope with chronic pain. The undersigned found petitioner to be credible and persuasive, both in her testimony and behavior.

Lastly, on the issue of whether petitioner is completely disabled from employment, Dr. Stephen Kalat, a neuropsychologist, assessed petitioner's neurocognitive status on November 19, 2014 and summarized that "Ms. Petronelli [was] disabled from either professional employment or competitive employment" "based on her performance during the examination and her history of cyclic patterns of increasing pain . . . ." Pet. Ex. 21 at 13. Dr. Kalat completed petitioner's neuropsychological evaluation over the course of three days (when in most cases, according to Dr. Kalat, a patient would complete a study in one day) because she "presented with increasing pain over the three days of testing due to [the] cognitive demands of the testing process," she evidenced significant pain behaviors, having to get up, take breaks, and move around in response to her pain, and because she had difficulty with performing tasks for three days in a row." Id. at 13. Dr. Kalat noted petitioner's pain was "often 1-3 on average, and was 6.5/10 at the time of [the] initial interview." Id. He further described that petitioner's "pain flare-ups [would] go from 6 to 10 on a 1-10 scale of pain severity" and that stress and cognitive challenges increase[ed] her pain level . . . ." Id. Dr. Kalat concluded that petitioner's "cognitive-type complaints [were] related to her chronic pain condition[,] which impinge[d] on her attentional capacities." Id. at 12. He further concluded that her chronic pain appear[ed] to cause chronic stress, variations in mood, sleep

---

[2] Petitioner's application was approved on December 31, 2013, discharging approximately $137,000 of student loans based on total and permanent disability.

2

disturbance, fatigue, and other aspects of suffering, such as its high degree of interference in her life goals, secondary to her disability." Id. at 12. Dr. Kalat found petitioner credible and not "exaggerating her cognitive complaints or her psychological condition." Id. Petitioner passed all the validity and reliability indicators of the neuropsychological exam. Id.

Petitioner's vocational expert, Dr. Staci Schonbrun, opined that, based on the above physical and mental limitations noted in the record, it seemed "unlikely" that petitioner would be capable of maintaining gainful employment on either a part-time or full-time basis. See Pet. Ex. 37 at 3-4; Pet. Ex. 23. The undersigned agrees. Respondent's vocational expert, Mr. Edward Bennett, believed that, based on the "objective" medical records, "nothing would preclude petitioner from returning to work as an associate attorney with an allowance for self-and/or reasonable accommodations." Respondent's Exhibit ("Res. Ex.") J at 3. Mr. Bennett's opinion was unpersuasive as the undersigned found his vocational reports unreliable and not credible. For example, Mr. Bennett mischaracterized and disregarded petitioner's seven years of practice as in-house counsel in order to significantly underreport petitioner's past earnings to then conclude that she was not entitled to past lost wages because her post-injury earnings capacity would be twice her pre-injury earnings. See Res. Ex. D at 111-14. This approach was criticized by Dr. Schonbrun as lacking sound vocational methodology, and rightfully so. See Pet. Ex. 23 at 8. Notwithstanding this illogical approach to assessing the wage issue in this case, Mr. Bennett also inappropriately mischaracterized petitioner's medical records and social media posts to disparage her candor and credibility.

Consequently, based on the methodology and figures provided by Dr. Schonbrun, petitioner is awarded **$600,000.00 for past lost wages** on the following rationale:

- Petitioner experienced a vaccine injury in October 2010 while out of the job market due to family obligations. According to petitioner, in the beginning of that year, prior to the vaccine injury, she was actively seeking opportunities to re-enter the job market. The undersigned finds that had petitioner not experienced a vaccine injury, she likely would have returned to the practice of law, given her education and work experience. However, considering the challenging legal job market in 2010, and petitioner's testimony of the challenges she encountered in her job search, petitioner would have likely spent the remaining months of 2010 looking for employment. Thus petitioner is awarded $0.00 for lost wages in 2010.

- In 2011, according to Dr. Schonbrun, petitioner would have entered the job market at the 25th percentile of earnings by lawyers in the State of Colorado, which was approximately $75,000 a year on a full-time basis. See Pet. Ex. 37 at 1-2. The undersigned believes these relatively low levels for an attorney with eight and half years of experience, mostly as in-house corporate counsel, reasonably reflects the challenge of subsequent re-entry into the work force after a period of absence, such as for child care responsibilities. Thereafter, petitioner's earnings would have gradually increased over the following five years to reach the median yearly salary of approximately $125,000. Id. at 2. Thus petitioner is awarded the following amounts for lost wages for 2011 through 2016: $75,000 for 2011; $85,000 for 2012;

$95,000 for 2013; $105,000 for 2014; $115,000 for 2015; and $125,000 for 2016. The total amount of petitioner's **lost wages is $600,000.00**.

On the issue of future lost wages, based on petitioner's expected retirement age of about sixty-four and half years (see petitioner's exhibit 17 at 1), petitioner is awarded $1,625,000.00 for future lost wages at $125,000 per year from 2017 until retirement at 64.5 years. The parties are **ORDERED** to file a joint status report **by Thursday, March 3, 2016** reducing this figure to net present value at a 1% discount rate.

### II.  Past and Future Pain and Suffering

Based on a review of the record, some of which are discussed above, and the testimony provided by petitioner at the hearing, petitioner is awarded **$250,000.00 for past pain and suffering**. An award for future pain and suffering would exceed the statutorily prescribed amount for damages in this category, therefore there is no award for future pain and suffering. See 42 U.S.C. § 300aa-15(a)(4).

### III.  Past Unreimburseable Expenses

Petitioner argued that she is entitled to $9,309.14 for past unreimburseable expenses and related mileage. See Res. Ex. O. Respondent recommended that petitioner receive $8,186.69 for these expenses. Id. Based on a review of petitioner's itemized list of out-of-pocket expenses and mileage, exhibit 35, and respondent's recommendations, petitioner is awarded **$8,344.64 for past expenses** pursuant to 42 U.S.C. § 300aa-15(a)(1)(B).

### IV.  Life Care Items

Concerning petitioner's life care items, the undersigned awarded expenses for items which would ordinarily be covered by an employer, such as a health insurance premium, and awarded expenses for items which are reasonable and necessary as a result of petitioner's disability. In light of the significant amount for wage loss petitioner is awarded, more routine items of personal care and other typical expenses are not awarded because such items would ordinarily be purchased by petitioner from her income had she been employed.[3]

---

[3] Petitioner did not receive these life care items for the following reasons:

- Amounts to cover the premiums and co-payments for Medicare parts B, D and F as these costs would be the responsibility of a retired person once she was eligible for Medicare programs.
- The All-Terrain Wheelchair with accessories were not awarded as the undersigned found these items were not necessary to support petitioner's life style, which she described at the hearing.
- Just Roll with It, Roll Easy Lotion Applicator, Hamilton Beach Electric Can Opener, Oster Food Processor, Phillips Sonicare Toothbrush, Zim Jar Opener, Universal Cuff, Easy Grip Spatula, Wall Mounted Soap and Shampoo Dispenser, and a Gel Mat for the

4

With regard to the figure for petitioner's life expectancy, the life care tables published by the Center for Disease Control indicates a life expectancy of 31.1 years for a black female, age 50.4[4] I reduced that number to 30 years based on her impaired health status.

Petitioner is awarded the following life care items as proposed by her life care planner, Ms. Roberta Hurley, and as supported by the medical records and/or petitioner's testimony. See Pet. Ex. 29. As ordered above, **the parties shall file a joint status report providing the net present value of these life care items**.

- Anthem Silver Pathway HMO premium in the amount of $5,068.44 per year, now through 2029.[5] The total amount is $70,958.16.

- Co-pays for treatment by a neurologist in the amount of $45.00 per year, now to life expectancy. The total amount is $1,350.00.

- Therapeutic massage at $1,800.00 per year now to life expectancy. The total amount is $54,000.00.

- Acupuncture at $2,400.00 per year now to life expectancy. The total amount is $72,000.

- A cane at $22.00 now and every two years to life expectancy. The total amount is $330.00.

---

kitchen appeared to be routine items of personal care and/or typical expenses which an employee would ordinarily pay for from their income.
- A Queen Adjustable Bed with a memory foam mattress is not documented as a medical need.
- An IPad, including an amount for software and applications, Dragon Dictate software, and a rolling computer table appeared to be typical expenses.
- Hair extensions, as well as foot and nail care appeared to be typical expenses.
- Petitioner stated at the hearing that she was capable of driving short distances, accordingly a 2014 Chrysler Entervan Van was not awarded.
- An Electric Tricyle, Warm Water Therapy, Yoga, and an accessible gardening table appeared to be typical expenses.

[4] See U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR DISEASE CONTROL AND PREVENTION, *National Vital Statistics Reports Vol. 63, Number 7* (Nov. 6, 2014), available at http://www.cdc.gov/nchs/data/nvsr/nvsr63/nvsr63_07.pdf.

[5] The year 2029 is based upon a projected retirement date. Consequently, petitioner will become eligible for Medicare in 2030.

- Pride Go-Go Elite Scooter at $1199.00 now and every five years to life expectancy. As petitioner is not awarded amounts for maximum out-of-pocket expenses and a deductible under the Anthem HMO Plan, petitioner is awarded the cost for replacing the scooter every five years, as that will be an expense petitioner will incur out-of-pocket. The total amount is $7,194.00.

- Bath chair with back at $50.00 now and every five years to life expectancy. The total amount is $300.00.

- Pride Lift Chair at $812.00 now and every ten years to life expectancy. The total amount is $2,436.00

- Seat belt pull at $10.00 now and every two years to life expectancy. The total amount is $150.00.

- Button hook/zipper pull at $15.48 now and every five years to life expectancy. The total amount is $92.88.

- Home care from Bright Star Care at $21.00 per hour for 20 hours a week now to life expectancy. The total amount is $655,200.00.

- One pair of orthopedic shoes at $135.00 now and every year to life expectancy. The total amount is $4,050.00.

**IT IS SO ORDERED.**

<u>**s/Thomas L. Gowen**</u>
Thomas L. Gowen
Special Master