# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**

No. 12-285V

**Filed: May 12, 2016**

* * * * * * * * * * * * * * * * * * * * * *
MONTEZ PETRONELLI, *
*
Petitioner, *
v. *
*
SECRETARY OF HEALTH *
AND HUMAN SERVICES, *
*
Respondent. *
* * * * * * * * * * * * * * * * * * * * * *

**Gowen,** Special Master:

Damages; Present Value; Discount Rate.

Ronald C. Homer, Conway Homer & Chin-Caplan, P.C., Boston, MA, for petitioner.
Michael P. Milmoe, United States Department of Justice, Washington, DC, for respondent.

## DECISION ON DAMAGES[1]

A damages hearing was held on February 10, 2016. At the conclusion of the hearing, the undersigned issued a bench ruling awarding petitioner damages for past and future lost wages, past pain and suffering, past expenses, and various life care items. On February 22, 2016, a Ruling on Damages, which memorialized my bench ruling, was issued. The parties were then ordered to file a joint status report providing the present value of the amounts awarded to petitioner for future wage loss and items of future medical and life care, at a 1% discount rate. Thereafter, the parties raised issues of a tax offset to the amount for petitioner's future lost wages, an adjustment for fringe benefits, a wage growth rate, and the appropriate rate to reduce the future awards to present value. Respondent filed a report from economist Dr. Patrick Kennedy on April 20, 2016, and petitioner filed a responsive expert report from George McLaughlin, MBA, CEA, CVA on May 4, 2016. Respondent filed a responsive expert report from Dr. Kennedy on May 10, 2016.

This case is now ripe for a decision on damages.

---

[1] Because this decision contains a reasoned explanation for the undersigned's action in this case, the undersigned intends to post this ruling on the website of the United States Court of Federal Claims, in accordance with the E-Government Act of 2002, 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). As provided by Vaccine Rule 18(b), each party has 14 days within which to request redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b).

## I. **Past and Future Lost Wages**

A comprehensive discussion of petitioner's award for past and future lost wages can be found in the Ruling on Damages issued on February 22, 2016. In summary, the undersigned considered the parties' filings in support of their respective positions on all issues relating to petitioner's damages. Specifically on the issue of petitioner's lost wages, petitioner's vocational expert reports and supportive literature, her testimony at the hearing, and the striking impression of her current condition persuasively established that she remains completely disabled from professional employment as an attorney or any other employment. This finding was also well supported by the medical records. The undersigned found that the reports from respondent's vocational expert, Mr. Edward Bennett, were not reliable or credible, as he mischaracterized the record before him. Consequently, based on the methodology and figures provided by petitioner's vocational expert, Dr. Staci Schonbrun, petitioner was awarded a raw figure for past and future lost wages in the amount of $2,225,000.00 based on the following rationale:

- Petitioner experienced a vaccine injury in October 2010 while out of the job market due to family obligations. According to petitioner, in the beginning of that year, prior to the vaccine injury, she was actively seeking opportunities to re-enter the job market. The undersigned found that had petitioner not experienced a vaccine injury, she likely would have returned to the practice of law, given her education and work experience. However, considering the challenging legal job market in 2010, and petitioner's testimony of the challenges she encountered in her job search, the undersigned determined that petitioner would have likely spent the remaining months of 2010 looking for employment. Thus petitioner was awarded $0.00 for lost wages in 2010.

- In 2011, according to Dr. Schonbrun, petitioner would have entered the job market at the 25th percentile of earnings by lawyers in the State of Colorado, which was approximately $75,000 a year on a full-time basis. *See* Pet. Ex. 37 at 1-2. Thereafter, petitioner's earnings would have gradually increased over the following five years to reach the median yearly salary of approximately $125,000. *Id.* at 2. Thus petitioner was awarded the following amounts for lost wages for 2011 through 2016: $75,000 for 2011; $85,000 for 2012; $95,000 for 2013; $105,000 for 2014; $115,000 for 2015; and $125,000 for 2016. The total amount of petitioner's **past and present lost wages was $600,000.00**.

- Based on petitioner's expected retirement age of about sixty-four and a half years, see petitioner's exhibit 17 at 1, petitioner was awarded $1,625,000 for future lost wages at $125,000 per year from 2017 until retirement (13 years). Adjustments of this amount for wage growth, tax offsets, fringe benefits, and reduction to present value are made below.

## II. **Past and Future Pain and Suffering**

Based on a review of the record and the testimony provided by petitioner at the hearing, petitioner was awarded **$250,000.00 for past pain and suffering** pursuant to 42 U.S.C. § 300aa-15(a)(4).

## III. Past Unreimbursable Expenses

Petitioner submitted a statement claiming $9,309.14 for past unreimbursable expenses. Based on a review of petitioner's itemized list of out-of-pocket expenses and mileage, exhibit 35, and respondent's recommendations, petitioner was awarded **$8,344.64 for past expenses** pursuant to 42 U.S.C. § 300aa-15(a)(1)(B).

## IV. Life Care Items

Concerning petitioner's life care items, the undersigned awarded expenses for items which would ordinarily be covered by an employer, such as a health insurance premium; and awarded expenses for items which are reasonable and necessary as a result of petitioner's disability. In light of the significant amount for wage loss petitioner was awarded, more routine items of personal care and other typical expenses were not awarded because such items would ordinarily be purchased by petitioner from her income had she been employed. Petitioner was not awarded amounts for a wheelchair accessible van, an all-terrain wheelchair and associated expenses, as it appeared that petitioner was capable of walking short distances and driving short distances in a standard automobile.

Petitioner was awarded the following life care items as proposed by her life care planner, Ms. Roberta Hurley, and as supported by the medical records and/or petitioner's testimony. *See* Pet. Ex. 29.

- Anthem Silver Pathway HMO premium in the amount of $5,068.44 per year, now through 2029.[2]

- Co-pays for treatment by a neurologist in the amount of $45 per year, now to life expectancy.[3]

- Therapeutic massage at $1,800.00 per year now to life expectancy.

- Acupuncture at $2,400.00 per year now to life expectancy.

- A cane at $22.00 now and every two years to life expectancy.

- Pride Go Go-Elite Scooter at $1199.00 now and every five years to life expectancy. As petitioner was not awarded amounts for maximum out-of-pocket expenses and

---

[2] Petitioner will become eligible for Medicare in 2029.

[3] I have modestly adjusted the life expectancy for a 51 year old female from 30.5 years as provided by the National Center for Health Statistics to 30 years, based on her health.

a deductible under the Anthem HMO Plan, petitioner was awarded the cost for replacing the scooter every five years, as that will be an expense petitioner will incur out-of-pocket.

- Bath chair with back at $50 now and every five years to life expectancy.
- Pride Lift Chair at $812.00 now and every ten years to life expectancy.
- Seat belt pull at $10.00 now and every two years to life expectancy.
- Button hook/zipper pull at $15.48 now and every five years to life expectancy.
- Home care from Bright Star Care at $21.00 per hour for 20 hours a week now to life expectancy.
- One pair of orthopedic shoes at $135.00 now and every year to life expectancy.

## V. Discussion of Rate of Reduction to Present Value, Tax Offsets, Wage Growth and Fringe Benefits

At the conclusion of the damages hearing in this case, and after review and consultation with counsel, I announced a decision awarding damages to Ms. Petronelli. I was persuaded that she had suffered substantial and permanent disability secondary to the flu vaccine and Guillain-Barré Syndrome.[4] As informal resolution of the amount of petitioner's damage had been stalled for approximately two years, and I was persuaded that petitioner's living conditions (supporting herself and a child on about $800.00 a month) were desperate, I decided that a decision on damages should be rendered promptly in order to alleviate that condition.

The only matter outstanding at the conclusion of the hearing, in my view, was to have an economist calculate the tax offset and a reduction to present value that I determined should be done at 1% rate. The respondent argued, in a post-hearing status report, that the decisions in the Program required that future wage loss be reduced by a figure equaling "net present value" and that a tax offset should be applied. Upon review of the cases submitted by respondent, it appeared that the concept of reduction to "net present value" was used in prior cases. *See Brown v. Sec'y of HHS*, No. 00-182V, 2005 WL 2659073 (Fed. Cl. Spec. Mstr. Apr. 17, 2012); *Watkins v. Sec'y of HHS*, No. 95-154V, 1999 WL 199057 (Fed. Cl. Spec. Mstr. Mar. 12, 1999).

Both of the cases cited above quoted the United States Supreme Court decision in *Jones & Laughlin Steel Corp. v. Pfeifer*, 462 U.S. 523, 524 (1983) in which the Court said:

> [B]y its very nature the calculation of an award for lost earnings must be a rough approximation. Because the lost stream can never be predicted with complete

[4] Chief Special Master Vowell had decided the issue of entitlement in late 2013, and the case was assigned to me shortly after my arrival at the court in March 2014. The parties discussed damages and refined expert reports at my direction since that time.

> confidence, any lump sum represents only a 'rough and ready' effort to put the plaintiff in the position he would have been if he had not been injured.

*Id.*

The Supreme Court noted that in almost any case, calculating the loss of future wages could become the subject of reasonable debate. *See Monessen Southwestern Railway Co. v. Morgan*, 486 U.S. 330, 351 (1988). The Court counseled against allowing the average personal injury trial to become a graduate seminar on economic forecasting. *Id.* at 341. After reviewing the advantages and disadvantages of the various calculation methods, the Court in *Jones & Laughlin Steel Corp.* found the "economic evidence distinctly inconclusive" and concluded that: "we do not believe a trial court adopting such an approach in a suit . . . should be reversed if it adopts a rate between one and three percent and explains its choice." *Jones & Laughlin Steel*, 462 U.S. at 548-49.

The Supreme Court reviewed various methods for calculating future losses, including a reduction by a nominal rate of return and the net present value method. A nominal reduction to present value requires a straight forward reduction for the time value of money received at the present time to compensate for future losses. This reduction is usually based upon the projected return on the investment of an awarded lump sum of money in a conservative investment, such as U.S. Treasury bonds. On the other hand, the use of "net present value" requires the estimate of future interest rates less the rate of future wage growth for the petitioner, with the difference representing the reduction factor.

The net present value methodology, to some extent, assumes that future interest rates will exceed future wage growth, and thus result in a net reduction of the raw sum awarded for future wage loss. It usually does not, but certainly could, contemplate that wage growth could be higher than interest rates at various times. In an attorneys' fee case in this Program, based upon a study[5] submitted by the respondent, it was indicated that since the beginning of the "great recession" in 2008, attorneys' fees had grown at an annual rate of 3.7% per annum, which was down from approximately 7% prior to the recession. *See McCulloch v. Sec'y of HHS*, 09-293V, 2015 WL 5634323 (Fed. Cl. Spec. Mstr. Sept. 1, 2015).

I had initially determined that this study, the Real Rate Report, appeared to provide a good guidepost for calculating the rate of future wage growth for Ms. Petronelli, who was an experienced corporate attorney prior to her disability. I observed to counsel in a status conference that given the low interest rates available on U.S. Treasury bonds, even as far out as 10 year maturities, the result of a net present value calculation would likely produce a negative net value, and at a minimum require no reduction, if not actually an increase, in the award.

At the same time, petitioner argued that I should add the value of fringe benefits and future wage growth to the initial sum awarded. The parties, at my direction, filed status reports in which they calculated tax offsets and reduction to present value at 1%. Petitioner added fringe benefits at 14.5% of wages, and performed the calculations to increase future wages by 3.7% as directed by

---

[5] The study, the Real Rate Report ("RRR"), was an extensive report on attorneys' fees billed to corporate clients. This study was cited by petitioner in this case as a reasonable guidepost for projecting attorney wage growth.

my order. *See* Status Report, docket no. 108, filed Mar. 25, 2016. Respondent also calculated tax offsets, but did not increase future wages or add fringe benefits. *See* Respondent's Exhibit ("Res. Ex.") M, filed Mar. 25, 2016. Respondent's counsel further argued that he needed to submit an expert report from Dr. Patrick Kennedy Ph.D. to support an argument for a higher reduction to present value greater than the 1% I had allowed, even though this rate appeared generous to the respondent's side given the current interest rates.

The respondent filed a report from Dr. Kennedy to which the petitioner responded with a report from an economist, George McLauglin, MBA, CEA, CVA. I held a status conference with counsel at which time respondent indicated that he would like to file a responsive report from Dr. Kennedy, which he had in hand. I advised respondent's counsel to file it promptly, which he did. Respondent also requested a hearing to permit live testimony from Dr. Kennedy and Mr. McLaughlin. Petitioner did not believe a hearing was necessary. As I had extensively reviewed the expert reports, the cases, and supporting economic data, I advised the parties that I did not believe an additional hearing would be necessary or helpful to the decision, and would only have the effect of further delaying the resolution of the case. Particularly, given that the difference between my conclusions as to a discount rate and a wage growth rate appeared to be well within the range of a reasonable rough approximation, and that I was planning to accept the respondent's estimate for fringe benefits, I denied the request for a hearing. *See* Order, docket no. 120, filed May 11, 2016.

Dr. Kennedy argued for a discount rate of 1.75%, while petitioner's expert, Mr. McLaughlin, found the 1% rate that I used initially to be reasonable. Dr. Kennedy's research suggested that over a period of 18 years, the Consumer Price Index averaged 2.2%, and interest rates averaged 3.4%. Res. Ex. N at 7. He opined that the Bureau of Labor Statistics ("BLS") estimate for wages in the legal industry would be more reliable than the RRR report, which was based on attorneys' fees rather than net income. *Id.* Based on the BLS numbers, Dr. Kennedy found that the legal industry growth rate was 0.25% above the rate of inflation, resulting in a net discount rate of approximately 1%, based on this 18-year time period. *Id.* at 7.

Nevertheless, Dr. Kennedy argued for a methodology he called the "real rate of return" or "net discount rate," which assumed that the relationship between earnings growth and interest rates remains relatively stable over time. Res. Ex. N at 8. Dr. Kennedy looked at three projections for future inflation, which ranged from 1.04% to 2.3% by 2020; and in one projection, a range up to 2.6% in later years. *Id.* at 5. Not surprisingly, the projections differed significantly, with the Congressional Budget Office projecting a range from 1.04% in 2018 to 1.1% in 2026, and the Federal Reserve projecting 2.3% by 2018, with a "longer run" projection of 2.6%, according to Dr. Kennedy. *Id.* Dr. Kennedy argued that I should consider average interest rates over the last 30 years, rather than the 18 years he discussed before, because the great recession occurred during the last 18 years, thus depressing growth rates during that time. *Id.* at 7. Dr. Kennedy neglected to mention that by going back 30 years, he included the latter part of the highest interest rate period subsequent to the OPEC oil crisis and the high inflation which Federal Reserve Chairman Paul Volcker attempted to curb by restricting the money supply. *See* Petitioner's Exhibit ("Pet. Ex.") 40 at 2-3.

Mr. McLaughlin argued that past averages are particularly poor predictors of future interest rates. Pet. Ex. 40 at 2. He argued that investors do not make judgments about bond purchases based

on past averages. *Id.* Mr. McLaughlin noted the important roles played by Federal Reserve Chairmen in addressing the challenges faced by the economy during their terms in office. He explained that Paul Volcker was challenged with curbing very high inflation after the formation of the oil cartel ignited inflation in the United States. To remedy that situation, Mr. Volcker severely tightened the money supply, which resulted in high interest rates. *Id.* Alan Greenspan, the subsequent Federal Reserve Chairman, believed in as little regulation as possible on the free market and he generally maintained modest interest rates, which led to the dot.com bubble and the housing bubble with severe recessionary consequences for the economy. *Id.* at 3. Subsequent Federal Reserve Chairmen, Ben Bernanke and Janet Yellen, have had the challenge of trying to stimulate the economy without the benefit of additional fiscal stimulus employed in the prior recession. *Id.* They have maintained interest rates close to zero. *Id.* at 2-3. Neither party mentioned the Federal Reserve Open Market Committee goal of maintaining inflation at 2% in order to achieve price stability and maximum employment.[6]

While Dr. Kennedy is correct that the Federal Reserve raised its federal funds rate by 0.25% in December 2015, and expects additional increases in the future, he neglected to mention that the Federal Reserve declined to raise interest rates at its March or April 2015 meetings by even another 0.25% because of the sluggish economic conditions. *See* Res. Ex. N at 5. Both economists agreed that if current interest rates were compared to current wage growth in the legal industry, whether using the 3.7% rate, which Mr. McLaughlin found reasonable, or the 2.65% rate found reasonable by Dr. Kennedy, the result would be a negative present value requiring no reduction. However, Dr. Kennedy argued that a 30-year average should be used to identify expected interest rates for U.S. Treasury bonds. He stated that "[o]ver the last 20 or 30 years, the five year Treasury note has averaged 3.5 to 4.8 percent." *Id.* Mr. McLaughlin, though recognizing that the net discount rate could be negative, stated that he thought that the time value of money had to be accounted for, and so concluded that a 1% rate was reasonable, which is a straight nominal rate and not a net rate. *See* Pet. Ex. 40 at 7.

I considered that the challenge for Ms. Petronelli is to be able to take a lump sum of money awarded to her at this time and purchase a portfolio of U.S. Treasury bonds that would provide her with a return sufficient to offset the reduction to present value. Consulting the official site of the U.S. Department of the Treasury on May 5, 2016, I found that the rate for 6 month bonds is 0.41%, for 1 year bonds 0.55%, for 2 year bonds 0.80%, for 3 year bonds 0.96%, and for 5 year bonds 1.32%.[7] If Dr. Kennedy's projections that interest rates could be in the 4 to 5% range in five years was accepted, then it would have to be recognized that a prudent investment advisor would have to invest money received now in shorter maturities because the market value of the bond purchased today, at low interest rates, will decline as interest rates on newer issues increase. In that eventuality, petitioner should not be caught with longer term maturities. If the money were invested in a laddered portfolio, equally divided among 6 month, 1 year, and 2 year maturities,

---

[6] *See* BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM, *Current FAQs: Why Does the Federal Reserve Aim for 2 Percent Inflation Over Time*, https://www.federalreserve.gov/faqs/economy_14400.htm (last visited May 11, 2016).

[7] *See* U.S. DEPARTMENT OF THE TREASURY, *Daily Treasury Yield Curve Rates*, https://www.treasury.gov/resource-center/data-chart-center/interest-rates/Pages/TextView.aspx?data=yield (last visited May 5, 2016).

then the average return would be 0.58%. If three year and five year maturities were added in equal increments, the average return would be 0.80%.

Dr. Kennedy's argument for the use of a 30-year average might carry more weight in the case of a younger person for whom the court would be projecting wage loss for 30 or 40 years into the future. But, in this case, I projected a work life expectancy of 13 years for Ms. Petronelli, given her current age of 51. So, while she may be able to earn higher returns in the outer years of this time period, she will not be able to earn those returns in the more clearly foreseeable near term. In fact, it can be argued that given that the 10-year maturity for U.S. Treasury bonds is currently at 1.88%, the market is projecting a much lower rate of growth of the interest rate than projected by Dr. Kennedy for a very substantial portion of the petitioner's work life expectancy.

Mr. McLauglin argued that the rate of return on conservative investments like U.S. Treasury bonds is affected by many considerations, and most prominently at this time, by the need to maintain growth in a sluggish economy. He cited an article by Lawrence Summers, the former Treasury Secretary and Harvard President, which suggests the likelihood of "secular stagnation" in the economy over the foreseeable future, as well as research by two economists at the San Francisco Federal Reserve Bank which shows that market expectations for inflation have shifted downward, implying that interest rates will be kept low by the Federal Reserve for a long period of time. *See* Pet. Ex. 40 at 5.

As can be seen from the above discussion, the projections of economists vary greatly and rely upon crystal balls that are rarely very clear, particularly when the intention is to look 5 or 10 years, or more, into the future. What is clear is that Ms. Petronelli's wage loss is projected over a 13-year work life expectancy, and that for at least the first third to half of that time period, it is unlikely that she will be able to obtain average investment returns in short and intermediate term U.S. Treasury bonds that would exceed Dr. Kennedy's projected wage growth rate of 2.65%, which is lower than the growth rate found reasonable by Mr. McLaughlin (3.7%).

While it seems likely that the petitioner would be able to obtain higher returns in the outer years if the economy returns to past growth rates, it should be noted that even the 20-year U.S. Treasury bond is paying only 2.22% as of May 4, 2016.[8] It seems unreasonable to base a decision on a discount rate on the most aggressive inflation models, particularly given that the petitioner would not be able to obtain those returns at any time in the foreseeable future, and her wage loss window is only thirteen years. Accordingly I will order, consistent with my original decision, that Ms. Petronelli's wage loss be discounted at a rate of 1%, beginning with the year 2017, to account for the potential of higher returns in the latter part of the 13-year wage period.

Petitioner argued that I should retain my original growth rate projection for attorney income in the corporate world at 3.7%, and I will. I find that this number comes closer to approximating future losses for a corporate attorney because most growth in attorney wages occurs as a result of progression up the ladder based on experience and expertise. The 3.7% and 2.65% figures approximate an overall number for the profession that does not account for individual progression over the course of a career, which I find reasonable to consider. Accordingly, either figure would provide a conservative estimate of the petitioner's likely future wage loss.

[8] *See supra* note 7.

In his supplemental report, Dr. Kennedy argued that Mr. McLaughlin's use of a figure for future wage growth compared to foreseeably available interest rates "implies" a negative net discount rate of 2.7%, which he argued contradicted Mr. McLaughlin's initial report in this case, filed in 2014. *See* Res. Ex. O at 2. However, both experts were directed by my post-hearing order to consider the definition of "net discount rate" as showing the difference between future wage growth and potential investment return, a methodology recognized by the Second Circuit in *Hawaiian Independent Refinery, Inc. v. Caleb Brett U.S.A. Inc.*, 928 F.2d 39, 44 (2d Cir. 1991) (as cited in *Watkins*, 1999 WL 199057, at *6). *See* Scheduling Order, docket no. 109, filed Apr. 4, 2016. When following this directive, and looking at 18-year data for wage loss compared to investment return, Dr. Kennedy concluded that a 1% net discount rate was appropriate. He then argued for a different methodology based on the assumption that interest rates and inflation maintained a relatively constant relationship over time, and that a 30-year look back was necessary. The Supreme Court in *Jones & Laughlin Steel Corp.* reviewed the various methodologies and concluded that the economic evidence in favor of one method or the other was "distinctly inconclusive." 462 U.S. at 548-49. As explained above, I have concluded that because of the relatively short term of future wage loss in this case, and the interest rates for short and intermediate term bonds that would be available for investment, the methodology proposed by Dr. Kennedy, (based on a 30-year look back period) was less likely to be predictive.

The petitioner argued that fringe benefits of 14.5% of salary should be added, while respondent argued for a 10% rate. On this issue, I find respondent's argument more reasonable and award a 10% rate, as I found 4% of the 14.5% figure petitioner suggested was attributable to medical benefits (which are awarded separately) and benefits like vacation pay (which are already calculated into total wage loss). Other benefits, such as retirement plans, life or disability insurance, unemployment insurance, and the employer's FICA payment, may reasonably constitute 10% of earnings. In his responsive report, Dr. Kennedy argues that 10% is reasonable but that I should consider a 7% rate because Mr. McLauglin included items like life and disability insurance in his calculation, and these items should be excluded as the person would have to be dead or disabled to benefit. *See* Res. Ex. O at 1-2. While I used the above list only by way of examples of employee benefits, Dr. Kennedy's argument misconstrues the nature of an employee benefit. The benefit is the payment of the premium by the employer for life and disability insurance, or any other kind of insurance for that matter, not the ultimate payout on such a policy. The 10% figure is reasonable.

The parties' respective tax offset calculations were in agreement, and I have adopted those figures in arriving at a final award for past, present, and future wage loss. Additionally, the parties used a 1% rate to calculate the cost of future life care items. *See* Joint Status Report, docket no. 104, filed Mar. 8, 2016. The parties provided that the total discounted present value of the life care items is **$759,367.89**. *Id.* I have also adopted that calculation.

In accord with the foregoing, I find that petitioner is entitled to the following amounts for damages:

| | |
|---|---|
| Past Pain and Suffering | $250,000.00 |

| | |
|---|---|
| Past and Present Wage Loss with 10% Fringe Benefits Reduced by Tax Offset | $480,906.00[9] |
| Future Wage Loss | $1,471,306.52[10] |
| Future Medical and Life Care Items | $759,367.89[11] |
| Past Expenses | $8,344.64 |
| Total Award | $2,969,925.05 |

## VI. Form of Payment

Section 15(f)(4)(A) of the Vaccine Act provides that compensation shall be paid "in a lump sum of which all or a portion may be used as ordered by the special master to purchase an annuity or otherwise to be used, with the consent of the petitioner, in a manner determined by the special master to be in the best interests of the petitioner." Petitioner has asked for a lump sum payment of compensation with no annuity. The undersigned finds this request reasonable as petitioner is an adult woman with professional experience as a corporate attorney, and thus reasonably capable of making an informed decision. Accordingly, **petitioner is awarded the following compensation for all damages that would be available under 42 U.S.C. § 300aa-15(a):**

1. **A lump sum payment of $2,969,925.05 in the form of a check payable to petitioner, Montez Petronelli.**

The Clerk of the Court is directed to enter judgment in accordance with this decision.[12]

**IT IS SO ORDERED.**

**s/Thomas L. Gowen**
Thomas L. Gowen
Special Master

---

[9] *See* Res. Ex. N Tab E at 1 from which this number was taken.

[10] In petitioner's status report filed March 25, 2016, petitioner provided figures for the present value of future wages at a 1% discount rate. *See* Status Report, docket no. 108, filed Mar. 25, 2016. The present value of her wages, from 2017 to retirement in 2030, was added to provide a total net present value for future wage loss of $1,337,551.40. Then, a 10% fringe benefit rate was added to this net present value to arrive at $1,471,306.52 for future wage loss.

[11] *See* Joint Status Report, docket no. 104, filed Mar. 8, 2016, from which this figure is taken.

[12] Pursuant to Vaccine Rule 11(a), entry of judgment can be expedited by each party filing a notice renouncing the right to seek review.